UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRIS HILL, *et al.*, | No. C-12-00372 DMR |
| Plaintiffs, | **ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| BAY AREA RAPID TRANSIT DISTRICT, *et al.*, | |
| Defendants. | |

This case arises out of the shooting death of Charles Hill by BART police officer James Crowell on July 3, 2011. Plaintiffs Chris Hill, personal representative of the Estate of Charles Hill, and the Estate of Charles Hill assert civil rights claims against Crowell, Officer Myron Lee, the Bay Area Rapid Transit District, and Chief of BART Police Kenton Rainey. Before the court is Defendants' Motion for Summary Judgment. [Docket No. 34.] The court conducted a hearing on August 29, 2013 at which the parties were represented by counsel. For the following reasons, the motion is GRANTED.

**I. Factual Background**

The key facts leading up to Mr. Hill's death are undisputed.[1] On Sunday, July 3, 2011, Crowell was patrolling the Civic Center, 16th Street and 24th Street BART stations in San Francisco with fellow BART police officer Lee. (SUF 5, 6.) While at the Powell Street station, Crowell and Lee received a dispatch call about a possibly intoxicated white male who was on the platform at the Civic Center station. (SUF 7, 8.) In a second radio call, dispatch reported that the subject was "upset or agitated" and provided a description of the man's clothing. (Allen Decl., Jul. 18, 2013, Ex. A, Crowell Dep. Jun. 6, 2013, 61:14-62:4.)

Crowell and Lee traveled on BART to the Civic Center station. (SUF 9.) As they stepped off the train onto the platform, Crowell immediately saw the man who matched the dispatch description, decedent Charles Hill ("Hill"), standing about 30 feet away. (SUF 10, 11.) Hill was holding a clear glass bottle with a red cap, the size of a wine bottle, which Crowell believed to be a bottle of vodka. (SUF 12, 13; Crowell Dep. 70:17-21.) In the area between the officers and Hill, there was a cement bench with at least one person sitting on it. (SUF 15.) The distance between Hill and the person seated on the bench was three to five yards. (SUF 16.)

Lee moved toward Hill, while Crowell approached Hill from the right. (SUF 17.) Lee yelled to Hill "'[h]ey, come over here,'" (Allen Decl., Ex. B, Lee Dep. Jun. 25, 2013, 54:10-13), and Crowell motioned to Hill and called out to him to get his attention. (SUF 18, 19.) In response, Hill, still facing the officers, stepped backwards five to six steps away from them in the direction of the train tunnel. (SUF 20, 21.) As Hill backpedaled, both officers stepped forward towards Hill. (SUF 22.) Crowell then lost sight of Lee behind a metal sign between them. (SUF 23.) As the officers approached him, Hill threw his glass bottle in the direction of the officers. (SUF 24; Lee Dep. 65:18-20.) The bottle hit the metal sign between the officers and broke; Crowell felt the spray of the liquid from the broken bottle. (SUF 25; Lee Dep. 77:8.) Lee stepped to his right to take cover

---

[1] Unless otherwise stated, the facts set forth below are undisputed. They are taken from the joint statement of undisputed facts submitted by the parties in connection with this motion. [Docket No. 35 (Joint Statement of Undisputed Facts, "SUF").] In their opposition, Plaintiffs contend that certain key facts about the shooting remain disputed, even though they previously agreed that those same facts are undisputed. As discussed below, Plaintiffs have not submitted evidence sufficient to create genuine disputes of fact nor have they offered any reason why the court should permit them to withdraw their previous agreement and representation to the court that certain facts are undisputed.

2

1   behind the sign; he slipped in the liquid from the bottle and fell to the ground. (SUF 26.) Once Lee
2   fell, he lost sight of Hill. (SUF 44; Lee Dep. 78:20-22.)
3         After Hill threw the bottle, he stepped backwards an additional five to six steps, and Crowell
4   lost sight of him behind a pillar. (SUF 28, 29.) Crowell then stepped to his right to look around the
5   pillar and saw Hill coming towards him on the left-hand side. (SUF 30.) Hill was "moving fairly
6   rapidly" towards Crowell and had taken five to six steps in Crowell's direction. (SUF 31; Crowell
7   Dep. 86:17-19.) Crowell then saw that Hill was holding a knife or sharp object in his right hand at
8   waist level, with the knife pointing outward from Hill's body. (SUF 32, 33.) Hill maintained a fist-
9   like grip on the blade handle. (SUF 34.) At that point, Hill was approximately 25 feet away from
10  Crowell. (Crowell Dep. 91:9-12.) Crowell immediately drew his gun, pointed it at Hill and ordered
11  him to drop the knife. (SUF 35.) Hill did not respond but instead continued moving towards
12  Crowell. (SUF 36; Crowell Dep. 93:8-15.) Hill then "start[ed] to move [the knife] towards . . . his
13  head, shoulder level," making a "throwing motion" as if he were going to throw a baseball. (SUF
14  37; Crowell Dep. 89:9-21; 94:11-14.) Crowell thought Hill was going to throw the knife, and as Hill
15  "was right at the top of the throw," Crowell fired three shots. (SUF 38, 39, 41; Crowell Dep. 94:17-
16  95:9.) After the third shot, Hill fell to the ground. (SUF 42.) Crowell estimated there was
17  approximately 15 feet between him and Hill at the time he fired. (SUF 40.)
18        Defendants submitted BART surveillance video which shows Crowell during the shooting.
19  Defendants also submitted an expert report regarding the video by forensic image analyst Michael
20  G. Schott; Plaintiffs did not object to Schott's report. (Allen Decl. Ex. C ("Schott Report"); Ex. E
21  (BART video).) The video, which does not have sound, shows Crowell's actions immediately prior
22  to and during the shooting. It does not show Hill or Lee. On the video, Crowell draws his gun, and
23  then appears to speak twice before firing. Around the time Crowell fires his gun, a flying object,
24  which the parties identified as Hill's knife, appears in the video frame. (Allen Decl. Ex. E.)
25  According to Schott, the muzzle flash on the video from Crowell's first firing was recorded seven-
26  tenths of a second prior to the first appearance of the knife as it enters the video camera range.
27  (Schott Report at 4.) While the video contained insufficient data for Schott to determine the knife's
28  velocity at the moment Hill threw it, Schott opines that the knife's path, including "the level of

3

attained elevation as well as total distance to point of rest," was "inconsistent with a weak or casual lob or gentle toss of the knife." (Schott Report at 4.)

Lee did not witness the confrontation between Hill and Crowell. He recalled that he heard the gunshots either while he was falling or while he was pushing himself up from the ground. (SUF 43.) Lee testified that he did not hear Crowell say anything during the period between the breaking of the bottle and the gunshots. (Lee Dep. 79:9-80:11.) Once he was on his feet, Lee approached Hill, rolled him over to his back, and applied pressure on the wound until the paramedics arrived and took over. (SUF 45, 46, 48.) Hill later died of his wounds.

In their Complaint, Plaintiffs assert five claims against Crowell and Lee: 1) excessive force in violation of the Fourth Amendment; 2) wrongful death based on violations of the Fourth and Fourteenth Amendments; 3) an unspecified § 1983 civil rights claim; 4) a state law wrongful death negligence claim, pursuant to California Code of Civil Procedure sections 377.60 and 377.61; and 5) a California Civil Code section 52.1 (Bane Civil Rights Act) claim. Plaintiffs also assert a Section 1983 claim against Bay Area Rapid Transit District and Rainey under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Defendants move for summary judgment on all claims.

## II. Legal Standards

A court shall grant summary judgment "if . . . there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Id.* at 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving part has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit

4

or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co.*, 594 F.2d at 738.

### III. Discussion

#### A. Excessive Force

Defendants seek summary judgment on Plaintiffs' first and fourth[2] causes of action for excessive force in violation of the Fourth Amendment on the grounds that Crowell's use of deadly force was reasonable.

A claim of excessive force in the context of an arrest or investigatory stop implicates the Fourth Amendment right to be free from "unreasonable . . . seizures." U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394 (1989). Courts analyze claims of excessive force under an "objective reasonableness" standard. *Bryan v. MacPherson*, 630 F.3d 805, 817 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 395). The reasonableness inquiry in excessive force cases is an objective one: whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation and without the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citations and internal quotation marks omitted).

---

[2] Plaintiffs' fourth cause of action is an unspecified § 1983 civil rights claim and is duplicative of the first cause of action for excessive force.

Because the reasonableness standard is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The "most important single element" is whether there is an immediate threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). These factors "are not exclusive. Rather, [the court] examine[s] the totality of the circumstances and consider[s] 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan*, 630 F.3d at 826 (citing *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)). When the challenged force is deadly force, it "satisfies Fourth Amendment standards '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1115 (9th Cir. 2005) (quoting *Tenn. v. Garner*, 471 U.S. 1, 11 (1985)).

"[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted). However, if the court concludes, "after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances," defendants can still prevail on summary judgment. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

The Ninth Circuit has cautioned that in excessive force cases resulting in a death, the trial court must be "wary of self-serving accounts by police officers when the only non-police eyewitness is dead." *Long v. City and Cnty. of Honolulu*, 511 F.3d 901, 906 (citing *Scott*, 39 F.3d at 915). Accordingly, a court "must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert

1  testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent
2  and consistent with other known facts." *Scott*, 39 F.3d at 915 (citations omitted).

3      The key record facts about the events leading up to Hill's shooting are undisputed. What
4  started as a routine response to a relatively minor offense – possible public intoxication – quickly
5  and tragically escalated into an armed encounter. When the officers identified and began to
6  approach Hill, Hill retreated from them. After throwing a glass bottle in the direction of the officers,
7  Hill backpedaled five or six steps more. However, when out of Crowell's line of sight, Hill changed
8  direction, pulled out a knife and moved "fairly rapidly" towards Crowell. He ignored Crowell's
9  command to drop the knife and advanced on Crowell, elevating his shoulder and cocking his arm to
10 throw the knife as if he were throwing a baseball. As Hill continued to move toward Crowell,
11 Crowell believed Hill was going to throw the knife. In fact, Hill did throw the knife, either before he
12 was shot or while being shot by Crowell. Thus, there is uncontested evidence that Hill posed an
13 immediate threat to officer safety.[3] As noted, a police officer may reasonably use deadly force
14 where he "'has probable cause to believe that the suspect poses a threat of serious physical harm,
15 either to the officer or to others.'" *Blanford*, 406 F.3d at 1115 (quoting *Garner*, 471 U.S. at 11); *see*
16 *also Smith*, 394 F.3d at 702 (holding that most important element to consider when examining
17 reasonableness of use of force is whether suspect poses immediate threat to safety). In addition, the
18 Ninth Circuit has stated that "where a suspect threatens an officer with a weapon such as a gun or a
19 knife, the officer is justified in using deadly force." *Smith*, 394 F.3d at 704.

20     Plaintiffs' opposition rests on the contention that material disputed facts exist as to whether
21 Hill posed a serious threat to Crowell's safety. First, Plaintiffs assert that a jury should determine
22 whether Hill possessed a knife and whether he was attempting to throw it while moving towards
23 Crowell. Plaintiffs' position directly and inexplicably contradicts the key facts that Plaintiffs
24 previously agreed were undisputed, as set forth in the parties' joint statement. (*See* SUF 31-39
25 (describing how Hill gripped the knife and continued to move toward Crowell as he elevated his

---

[3] Although it is undisputed that at least one person sat on a bench between Hill and the officers, the record does not contain any evidence about whether that person remained on the bench up to and including the moment that Crowell shot Hill.

1 shoulder towards a throwing motion).)  More importantly, Plaintiffs have not submitted any
2 evidence to create disputes of fact regarding the threat facing Crowell.  It is thus undisputed that Hill
3 wielded a knife and moved to throw it as he advanced on Crowell.

4       Plaintiffs next attempt to create a dispute of material fact by arguing that Lee did not
5 corroborate Crowell's statements about the incident.  Plaintiffs focus on the brief period of time
6 commencing when Hill threw the bottle, the bottle broke, Lee slipped in the liquid from the bottle
7 and fell to the ground, and Lee heard gunshots.  Lee testified that he did not hear Crowell say
8 anything between the time Hill threw the bottle and when Crowell fired his gun.  According to
9 Plaintiffs, Lee's testimony calls into question Crowell's version of the facts that 1) Hill moved
10 forward and attempted to throw the knife; 2) Crowell called out "knife"; and 3) Crowell warned Hill
11 to drop the knife.  The court disagrees on all three points.  As to the first point, it is undisputed that
12 Hill moved toward Crowell and was in the process of throwing the knife when Crowell shot him.
13 (SUF 30-39.)  It is not surprising that Lee could not corroborate this undisputed fact, as Lee had
14 fallen on the ground and testified that he lost sight of Hill as a result.  (SUF 44; Lee Dep. 78:20-22.)
15 As to the second point, Plaintiffs attempt to create a dispute out of thin air.  No one, including
16 Crowell, testified that Crowell called out "knife"; it is unremarkable that Lee did not hear Crowell
17 say "knife" when, in fact, Crowell did not say it.  With respect to the third and final point, it is again
18 undisputed that Crowell warned Hill to drop the knife.  (*See* SUF 35-36 ("Upon seeing the knife,
19 Officer Crowell drew his firearm and ordered Mr. Hill to drop the knife.  Mr. Hill did not respond to
20 the command: he did not alter his demeanor or his actions.").)  That Lee did not hear Crowell say
21 anything before shooting Hill does not create a genuine dispute of fact, where the parties agree that
22 Crowell did in fact order Hill to drop the knife.

23       At the hearing, Plaintiffs conceded that Crowell justifiably could use deadly force if he was
24 being threatened with a knife.  However, Plaintiffs maintain that the *level* of threat posed by Hill
25 creates a genuine dispute of material fact that should be submitted to the jury for determination.
26 Facts that illuminate the level of threat posed by Hill could well make a difference in an excessive
27 force determination.  For example, a large, sure-footed, able-bodied man wielding a large knife
28 creates a different quantum of threat to officer safety when compared to a small, wobbly, disoriented

8

man wielding a pen knife. Unfortunately, there are virtually no record facts on these points. It is Plaintiffs' burden to produce significant probative evidence to support their claim that a genuine issue of material fact exists regarding the circumstances confronting Crowell up to and at the moment he shot Hill; speculation is insufficient. *See TW Elec. Serv., Inc.*, 809 F.2d at 630. Plaintiffs did not submit any evidence sufficient to create a genuine dispute of fact; the record is devoid of any physical description of Hill or of his behavior, or of any facts regarding his level of intoxication or potential mental illness – all facts which were readily available.[4] On such a sparse, undisputed and uncontradicted record, the court has no choice but to find that Crowell acted reasonably when using deadly force under these circumstances.

Plaintiffs assert that the video shows Crowell "coolly and calmly" dealing with the threat posed by Hill, which creates a genuine dispute as to the level of threat posed by Hill. Viewing the video, a juror could well disagree with Plaintiffs' characterization. But more to the point, Crowell's demeanor is not a material fact; whether Crowell subjectively feared for his safety is not material to the "objective reasonableness" standard for determining whether an officer used excessive force. As the Ninth Circuit has noted, *Graham* "clarified that the reasonableness inquiry turn[s] upon the circumstances confronting the officer, rather than the officer's subjective beliefs or intentions." *Price v. Sery*, 513 F.3d 962, 967, 971 (9th Cir. 2008) (citing *Graham*, 490 U.S. at 397, and holding that "[o]ur case law requires that a reasonable officer under the circumstances believe herself or others to face a threat of serious physical harm before using deadly force.").

---

[4] Plaintiffs make a number of factual assertions but did not submit evidence to support them. For example, Plaintiffs describe Hill as a "small, disheveled-looking middle aged white man," standing "a mere 5'6" tall and weigh[ing] a spindly 150 pounds." (Pls.' Opp'n 6.) Plaintiffs also assert that "eyewitnesses to the incident described Mr. Hill as a "Drunk Hippie," and that Crowell and Lee were "[a]rmed with the knowledge that they would be confronting a person described as a middle-aged, drunken homeless man." (Pls.' Opp'n 6.) However, Plaintiffs did not submit any evidence in support of these assertions, nor did they submit any statements by eyewitnesses. Moreover, Crowell contradicted assertions, testifying that dispatch did not say anything about Hill being a transient or homeless person, (Crowell Dep. 65:12-20), and denying that dispatch described Hill as a "hippie." (Crowell Dep. 65:21-24.) Finally, Plaintiffs make a number of references to Hill's alleged mental illness and/or mental impairment. However, there is no record evidence that Hill had a mental illness, nor is there any evidence of his impairment at the time of the shooting, such as his blood alcohol level at the time of his death.

Plaintiffs also argue that the video shows that the knife did not land near Crowell, demonstrating that he was never actually in harm's way.  However, the critical question regarding the threat to officer safety is whether the knife was thrown in the direction of the officer, not where it ultimately landed.  On this point, the record contains the following evidence: it is undisputed that Hill was continuing to move towards Crowell while elevating his shoulder to throw the knife, and that Hill's cocked arm was moving forward when Crowell fired the first shot.  (SUF 37-39.) Crowell did not recall seeing the knife thrown.  (Crowell Dep. 95:5.)  Schott's expert analysis of the knife path suggests that there may have been some minor contact of the knife with Crowell's body or equipment:

> The knife is first visible near the train at RFN 44, and may be visually tracked through RFN 50, at which time the knife is out of camera view while passing behind the officer's waist area.  The knife again becomes visible at RFN 57, by which time it has fallen to the platform.  The knife continues to move across the deck until it comes to rest at RFN 77.
>
> Attached to this report is image "Knife Photomerge," which depicts the time-lapse locus of points corresponding to the movement of the knife until it reaches the deck. The ascending parabolic curve occurs during RFN 44-50; once on the deck at RFN 57, the path of the knife is linear.  Based on what *appears* to be a slight change of heading and/or loss of velocity, there may have been some minor contact between the knife and some portion of the officer's body and/or equipment which deflected the path of the knife during RFN 51-56.

(Schott Report at 3 (emphasis in original).)  Thus, the uncontradicted evidence indicates that at the moment Crowell first fired his weapon, Hill was advancing on Crowell and was aiming the knife in Crowell's direction.  The only record evidence regarding the path of the knife once thrown indicates that Hill threw it in Crowell's direction.

Plaintiffs assert that Crowell should have considered less intrusive methods of dealing with the threat posed by Hill, citing *Bryan*, 630 F.3d at 831.  In *Bryan*, the Ninth Circuit held that an officer's use of a taser on an arrestee following a routine traffic stop constituted excessive force where the arrestee was unarmed, did not pose an immediate threat to the officer or to bystanders, and stood 20 feet from the officer, facing away from him.  *Id*. at 831-32.  The court held that the officer's failure to consider less intrusive means of effecting the arrest was a factor to consider in the *Graham* analysis.  However, the court also noted that it did not "challenge the settled principle that police officers need not employ the 'least intrusive' degree of force possible," and instead recognized "the

10

equally settled principle that officers must consider less intrusive methods of effecting the arrest and that the presence of feasible alternatives is a *factor* to include" in the analysis." *Id*. at 831 n.15 (emphasis in original). Here, Defendants argue that Crowell did not have alternative means to deal with Hill, as his other available weapons – baton, pepper spray, and taser – were ineffective with Hill 15 feet away with his arm raised to throw the knife. Plaintiffs do not challenge these assertions.

Finally, Plaintiffs argue that Crowell failed to provide an adequate warning to Hill that he would shoot him if Hill did not comply with his directions to drop the knife. However, Crowell had his gun pointed at Hill when he instructed him to drop the knife; the consequences of a failure to comply with the command should have been clear. *See Cosentino v. Kurtz*, No. CV 11-03206 GAF (SSx), 2013 WL 1927119, at *8 (C.D. Cal. Apr. 16, 2013) (noting that there was "nothing ambiguous about what [officers] wanted" where they had weapons drawn and pointed at suspect when issuing command to drop an axe). Further, there is no requirement that officers must give a warning prior to the use of force for the force to be reasonable. *See id*. In *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001), the only case cited by Plaintiffs on this point, the court held that "warnings should be given, *when feasible*, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." (emphasis added). Here, the situation unfolded in a matter of seconds. Approximately six to seven seconds elapse between the time Crowell draws his gun and says something, then fires the first shot. (Allen Decl., Ex. E.) In these circumstances, Defendant Crowell's order to Hill to drop the knife while he pointed his gun at him was sufficient.

The court has carefully considered all of the evidence in the record and concludes that there are no genuine disputes of material fact regarding the events leading up to Hill's shooting. The Ninth Circuit recently reiterated the Supreme Court's guidance that "'[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.'" *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396-97) (brackets in original). Essentially, in this case, the court must determine whether it is reasonable for a police officer responding to a report of a

minor disturbance to shoot an individual after he threw a glass bottle in the direction of the officer, retreated, then pulled a knife and reversed course towards the officer, winding up to throw the knife and coming within fifteen feet of the officer – all of which happened in a matter of seconds. The reasonableness must be judged from the perspective of an officer at the scene, and a reasonable officer in that situation could believe that he was in danger of being hit by a knife thrown seconds after having had a bottle thrown at him. Given that the Ninth Circuit has explicitly stated that an officer is justified using deadly force when threatened with a knife, *see Smith*, 394 F.3d at 704, the undisputed evidence, viewed in the light most favorable to Plaintiffs, shows that Crowell's use of deadly force was objectively reasonable at the moment that he shot Hill. Accordingly, the court grants summary judgment on Plaintiffs' excessive force claim.[5]

### B. Plaintiffs' Remaining Claims

Plaintiffs also alleged a Section 1983 wrongful death claim, state law claims for wrongful death and violation of California Civil Code section 52.1, and a *Monell* claim, all based on the allegation of excessive force. As Defendants are entitled to summary judgment on the excessive force claim, the court grants summary judgment on the remaining claims. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding there can be no municipal liability where there is no constitutional violation).

### IV. Conclusion

For the above reasons, the court grants Defendants' motion for summary judgment.

IT IS SO ORDERED.

Dated: September 18, 2013



DONNA M. RYU
United States Magistrate Judge

---

[5] As the court finds that Crowell's use of deadly force was reasonable, it need not reach Defendants' argument that Crowell and Lee are entitled to qualified immunity.

12